## Case No. 15,353.

UNITED STATES v. The HENRY C. HOMEYER.

[2 Bond, 217.] [1]

District Court, S. D. Ohio. Oct. Term, 1868.

WAR OF THE REBELLION—TRADE WITH INSURGENTS — TREASURY REGULATIONS — CONTRABAND ARTICLES— CONQUERED TERRITORY.

1. The policy of the legislation of congress and the action of the executive department of the United States, in reference to commercial intercourse between the loyal and insurgent states prior to March 31, 1863, was to prohibit trade with the insurrectionary states, not only in all articles contraband of war in the strict sense of the term, but all other articles which could be used by the insurgents to strengthen and support the rebellion.

2. Under rule 20 of the regulations of the treasury department of September 11, 1863, loyal persons were authorized to obtain permits to purchase for money, other than gold or silver, any of the products of the country within the lines of national military occupation, except when prohibited by order of the general commanding the department or other special military order, and to transport said products to market.

3. Dry goods, groceries, and medicines, sold to the inhabitants along the Mississippi river, in the year 1864, were not articles contraband of war by the legislation of congress or the regulations of the treasury department, or by the law of nations.

4. A steamboat having a permit from a special treasury agent to engage in purchasing cotton along the borders of the Mississippi river, within the limits of the states of Mississippi and Arkansas, was fully authorized in May, 1864, under the statutes of the United States, the president's proclamations and the instructions of the secretary of the treasury, to make such purchases, and the forfeiture of said boat and her cargo was not incurred by engaging in such trade.

In admiralty.

The District Attorney, for the United States. Lincoln, Smith & Warnock, for claimants.

LEAVITT, District Judge. This is a libel of information against the steamboat Henry C. Homeyer and cargo, including some nineteen thousand dollars in United States treasury notes. The grounds on which a

[1] [Reported by Lewis H. Bond, Esq., and here reprinted by permission.]

decree of condemnation is claimed, are stated in different forms in the libel, not necessary to be minutely noticed. They embrace substantially the charge that the steamboat was engaged in illicit trade and commerce in violation of law and the regulations of the secretary of the treasury: 1. In having on board goods and merchandise intended for sale and barter to rebels at places and within states in rebellion, which were contraband of war, and designed to give aid and comfort to the rebellion; 2. That the employés and agents of the owners of the boat purchased cotton from persons and in states in rebellion, and attempted to transport the same to a loyal state, without lawful authority.

Edward Parkman and Jesse W. Page, a mercantile firm at Memphis, in the state of Tennessee, have intervened as claimants of the boat and cargo, and have filed their answer, denying, in general terms, all the allegations of the libel charging illicit or unlawful trade or commerce.

The facts, in outline, are that the steamer left the port of Memphis, in April, 1864, and proceeded to Vicksburg, where purchases of various articles of merchandise were made by the agent of Parkman & Page for barter and sale in procuring cotton along the banks of the Mississippi river, in the states of Mississippi and Arkansas, then in rebellion against the United States. These purchases were made of different persons, and amounted to $7,917.71. The articles consisted chiefly of dry goods, groceries, boots and shoes, and medicines. The bills of these articles are exhibited in evidence, each bill indorsed by Milton Kennedy, as local special agent of the treasury department at Vicksburg, as approved by him. In connection with these bills of purchase is a permit, signed by said Kennedy, in his official capacity, in which the articles are designated as family supplies, and are permitted to go to the states of Mississippi and Arkansas "to be exchanged for cotton with loyal citizens, subject to the approval of the commanders of gunboats." It is also a fact in the case, that Parkman & Page had furnished their agent with, and placed on board the steamer, $25,000 in United States currency, intended to be used in the purchase of cotton. The steamer proceeded to several points on the Arkansas side of the Mississippi, and had purchased one hundred and nineteen bales of cotton, when the boat and cargo, including $19,000 in greenbacks, were seized under a military order, as engaged in unlawful trade with rebels, to be libelled and proceeded against as forfeited to the United States.

The question for the decision of the court is, whether this property is forfeited under the acts of congress and the treasury regulations applicable to the transactions in question. The first legislation on the subject of commercial intercourse with states and persons in rebellion requiring the notice of the court, is found in section 5 of the act of con-

gress of July 13, 1861 [12 Stat. 257]. It provides, that when the president by his proclamation shall have declared the inhabitants of any state, or any part of a state in insurrection against the United States, "all commercial intercourse by and between the same and citizens thereof and the citizens of the rest of the United States shall cease and be unlawful, * * * and all goods and chattels, wares and merchandise, coming from said state or section into other parts of the United States, and all proceeding to such state or section by land or water, shall, together with the vessel or vehicle conveying the same, * * * be forfeited to the United States: provided, however, that the president may, in his discretion, license and permit commercial intercourse with any such part of said state or section, the inhabitants of which are so declared in a state of insurrection, in such articles, and for such time and by such persons, as he in his discretion may think most conducive to the public interest; and such intercourse, so far as by him licensed, shall be conducted and carried on only in pursuance of rules and regulations prescribed by the secretary of the treasury." In pursuance of this law, the president issued his proclamation August 16, 1861 [12 Stat. 1262], declaring what states were then in rebellion, excepting, however, from its operation West Virginia and such other of the enumerated seceded states as might return to their allegiance, or might from time to time be controlled by the forces of the United States; and in the language of the above-recited section of the act of congress, declaring all commercial intercourse unlawful, and all property attempted to be transported without license or permission of the president through the secretary of the treasury, forfeited to the United States.

The next act of congress on this subject was that of May 20, 1862 [12 Stat. 404], supplementary to the act before referred to. Section 3 of the act authorized the secretary of the treasury to prohibit the transportation of any goods, wares, and merchandise, of whatever character and whatever might be their ostensible destination, whether by land or water, in all cases in which he might have reason to believe they were intended for any place in the possession or under the control of the insurgents, or there was imminent danger that they might fall into their possession or under their control. And the secretary of the treasury was authorized to make such rules and regulations as were necessary to carry out the objects of the law. And all property transported, or attempted to be transported, in violation of the law or the rules of the secretary, was to be forfeited to the United States.

The next act of the government requiring notice in this question is the proclamation of the president of March 31, 1863, declaring all commercial intercourse between the inhabitants of the insurrectionary states, with certain exceptions stated, unlawful, unless licensed and conducted according to the act of July 13, 1861, and the rules of the secretary of the treasury; and declaring that "all cotton, tobacco, and other products, and all other goods and chattels, wares and merchandise, coming from said states, with the exceptions aforesaid, into other parts of the United States, * * * without the license or permission of the president, through the secretary of the treasury, will, together with the vessel or vehicle conveying the same, be forfeited to the United States."

The next proclamation of the president is that of the same date as that just referred to. It is noteworthy as indicating a change in the policy of the government, and a relaxation, in some respects, of the rigid rules which had before been regarded as necessary in reference to the commercial intercourse between the states and sections in insurrection and the loyal states. After referring to the act of July 13, 1861, and the previous proclamations prohibiting all commercial intercourse between the people of the insurgent states, and the people of the other parts of the United States except as it should be carried on under the regulations of the treasury department, it recites, "that a partial restoration of such intercourse between the inhabitants of sundry places and sections heretofore declared in insurrection, * * * and the citizens of the rest of the United States, will favorably affect the public interests," and declares as lawful "such commercial intercourse between the citizens of loyal states and the inhabitants of such insurrectionary states, in the cases and under the restrictions described and expressed in the regulations prescribed by the secretary of the treasury bearing even date with these presents, or in such other regulations as he may hereafter, with my approval, prescribe."

The legislation of congress and the action of the executive department of the government, in reference to commercial intercourse between the loyal and insurgent states, is noticed as indicative of its policy up to the date of the two proclamations of March 31, 1863. That policy was obviously to prohibit trade with the insurrectionary states, not only in all articles contraband of war in the strict sense of the term, but all other articles which could be used by the insurgents to strengthen and support the rebellion. It was obviously of the greatest importance that stringent measures should be adopted to prevent the shipment or transportation of all breadstuffs, meat, and other agricultural products of the fertile North, which could be used to support the armies and the people of the rebel states, and to prohibit all other commercial intercourse which should give aid and comfort to the rebellion. But as the war progressed, and military possession and control of large portions of the rebellious states were gained, it was obvious that some modification of the previous restrictions was demanded by

the public interests. The government and the people of the North were greatly in need of cotton, the staple product of the rebellious states, and great inconvenience and injury were experienced in the North from the deficient supply and high price of that article. The president of the United States, in the proclamation of March 31, 1863, says distinctly that the public interests require a partial restoration of commercial intercourse "between the inhabitants of sundry places and sections heretofore declared in insurrection," and in express terms, under the authority of the act of congress, sanctions and licenses such intercourse, subject to the restrictions and regulations that may be prescribed by the secretary of the treasury. On September 11, 1863, the secretary of the treasury, with the approval of the president, promulgated regulations by which this permitted commercial intercourse was to be carried on. These rules are numerous and somewhat complicated in their character. I do not propose to notice the various rules thus prescribed, which have been referred to in the argument; nor to discuss or decide the point strenuously insisted on by the counsel for these claimants, namely, that some of these involve the exercise of legislative powers, which congress has not delegated to the executive department of the government, and which are, therefore, of no validity. I do not think it necessary to pass on this question in the present case. I shall, therefore, limit myself to the question, whether, conceding the authority of the treasury department to adopt the rules in question, the property libelled in this case is subject to forfeiture. The claim of the government asserted in the libel, as already noticed, is the forfeiture, not only of the steamboat, the cotton on board, and the merchandise purchased at Vicksburg, but also nineteen thousand dollars in United States treasury notes. The total value of these is large, and a decree of forfeiture will seriously affect the interests of these claimants. This being a proceeding under a highly penal statute, it is a case in which the right to such a decree must be made out strictissimi juris. And no presumptions or conclusions are allowable, unfavorable to the claimants, unless based on clear and indisputable facts, and sustained and demanded by the positive and explicit requirements of the law. And further, if the facts show clearly that the parties charged with the violation of the trade regulations applicable to the Western rivers, have been actuated by no disloyal motive, and have evinced a purpose and a desire to conform strictly to those regulations in all the transactions involved, the court will not, on grounds purely technical, base a decree of condemnation. A just government does not demand such an invasion of the great principles of justice.

The first inquiry presented is, was the steamboat Homeyer legally authorized or permitted to purchase cotton along the shores of the Mississippi river, in the states of Arkansas and Mississippi? The twentieth rule of the treasury regulations of September 11, 1863, declares that "all proper and loyal persons may apply in the prescribed form to the proper supervising special agent, or an assistant special agent designated by him, for authority to purchase for money, other than gold or silver, any of the products of the country within the lines of national military occupation in his agency, except when prohibited by order of the general commanding department, or other special military order, and to transport the same to market." Then follow certain regulations, directory to the treasury officials, pointing out specifically the preliminaries necessary before granting authority to engage in this trade. It was under this rule that the claimants, Parkman & Page, applied to, and obtained, from the proper treasury official at Memphis, a permit to purchase cotton along the Arkansas side of the Mississippi, and convey the same to market. This permit as granted was not exhibited in evidence at the hearing of this case, not being at that time, as I understood the claimants' counsel, in their possession, or within their control. Parol evidence, however, was offered, and admitted without objection, that such permit had been issued to the claimants; and also that the steamer had procured the proper clearance from the surveyor of customs at Memphis. In the argument, the non-existence of the permit was insisted on by the counsel for the government as one ground of forfeiture. The objection to the parol evidence of the permit not having been made when it was offered at the hearing, I suppose it can not be relied on as available to exclude it from the consideration of the court. The presumptions are strong, if not conclusive, that the boat was fully and legally authorized to engage in this trade. Memphis was then under martial law, and, it may well be inferred, the military authorities were vigilant in preventing any boat from leaving, unless assured that proper license had been granted, and that she was not about to engage in illicit trade. Moreover, there was on board a treasury official, called an agency aid, whose special duty it was to supervise the doings of the boat, and to detect all violations of law and of the treasury regulations. In addition to this, the steamer was under the surveillance of every gunboat on the river, and liable at any moment to be arrested for any act committed or omitted, in disregard of the law and the rules governing the trade. It is not reasonable to presume that the steamer would have been permitted to depart from Memphis, and to engage in the cotton trade, without due authority. But if there were any reasons to doubt the sufficiency of the evidence offered at the hearing, in relation to the permit granted to the claimants, I think they are now removed. It now appears that their counsel have procured sundry permits issued to them during the latter part of the winter of 1864, which, by agreement of counsel, have been ex-

hibited to the court. There can be no rational doubt that the steamer engaged in this trade under one of these permits. That the specific cotton purchased in the early part of May, 1864, which is in controversy in this case, was not reported to the treasury official at Memphis, is accounted for by the arrest of the boat and cargo, and their transfer to the custody of the law.

Without noticing in detail the numerous rules and regulations applicable to this trade, it is obviously within their spirit and intention to sanction and legalize the purchase and transportation of cotton by loyal citizens. So far as this could be done without giving aid, comfort, or support to the rebellion, it was not only permissible, but desirable. It was to be limited to places within the lines of our military occupation. The regulations prohibited payments for cotton in gold, or in articles declared to be contraband. The distinguished gentleman who was at the head of the treasury department, gives his views very clearly and distinctly on this subject, in his letter to Mr. Mellen, supervising special agent at Memphis, of July 3, 1863. He says: "There does not seem to me to be so much danger in intercourse which does not involve the furnishing of supplies." And he adds: "Intercourse such as this, it seems to me, might be safely permitted co-extensively with our lines of military occupation." Again, he states it as the object to be kept in view: "1. Non-intercourse between loyal states or districts and states or districts controlled by insurgents; and, 2. Modified intercourse between loyal states and districts, and states or districts partially regained to the Union." And in his letter of instruction to the special agents of the treasury of September 11, 1863, in relation to the regulations of that date, the secretary remarks as follows: "The following regulations are prescribed for the government of the several supervising assistant and local special agents and agency aids. * * * for the purpose of conducting the commercial intercourse licensed and permitted by the president, and preventing the conveyance of munitions of war or supplies to insurgents," etc. These instructions afford the clue to the true construction of the trade regulations of the treasury department in regard to the purchase and transportation of cotton. It was not intended to restrict or prohibit the purchase of cotton, within the lines of "our military occupation." Within those lines it could "be safely permitted" upon the condition simply, that payments therefor should not be made in gold, or in articles contraband of war, or in supplies for rebels in arms.

Now, it is a well known historical fact connected with the late rebellion, that in May, 1864, the government of the United States had the undisputed and entire military possession of, and control over, the Mississippi river from the mouth of the Ohio downward. Vicksburg and Port Hudson had fallen in the summer previous. The government, for the double purpose of protecting persons and property in transitu upon the river, and of preventing illicit trade and intercourse with the rebels on its borders, had wisely placed a sufficient number of gunboats to insure the safety of persons and property afloat, and to prevent all unlawful intercourse with rebels in arms which could in anywise strengthen or give aid and comfort to the rebellion. There can be no question that the river, and the shores of the river through its entire extent were within the lines of the military occupation of the Union forces. This military occupation was even more effectual and complete than if the government had established a cordon of forts and fortifications at short distances on both shores of the river, through the whole territory of the states in rebellion. Within the letter and spirit of the treasury instructions, then, the trading and procurement of cotton along the banks of the river was not prohibited, unless it involved the furnishing of supplies to the rebels, that would add to the military power of the rebellion. All munitions of war, and all articles of food, were within the inhibition, as were also all payments in gold in the purchase of cotton. Subject to these exceptions and limitations, the secretary did not deem it expedient to interfere with or prohibit the purchase and shipment of cotton. It was precisely the "modified intercourse between loyal states and districts, and states or districts, partially regained to the Union," as expressed in the secretary's letter of instruction before referred to, and which he thought could "be safely permitted." The court is not informed what other rules and regulations were promulgated by the secretary of the treasury, after the capture of Vicksburg and Port Hudson. It may be assumed, however, none were adopted more restrictive of trade and intercourse on the Mississippi than those already referred to. It would seem indeed to have been the true policy of the government, after that river came under its complete military control and supervision, to relax and modify the previous rules, so as to have afforded greater facilities for the procurement of cotton in the states of Mississippi and Arkansas. It is certain from the facts before the court, that in the spring of 1864, the officials of the treasury department, at Memphis, Vicksburg, and other points were disposed to give greater facilities for the procurement of cotton than at previous periods. It is in proof that Mr. Mellen, who was charged with the general superintendence of trade and intercourse upon the Mississippi, stated to one of these claimants that persons licensed to purchase cotton could buy of disloyal persons and rebels, if they chose to do so. And Mr. Yeatman, a treasury official at Memphis, swears that his instruc-

tions were not to require that those licensed to purchase cotton should be restricted in their purchases to persons known to be loyal.

Construing the statutes, the president's proclamations, and the instructions of the secretary of the treasury, in the light of the facts referred to, I can adopt no other conclusion than that the Homeyer was fully authorized to engage in the business of purchasing cotton, along the borders of the Mississippi, within the limits of the states of Mississippi and Arkansas. The owners. Parkman and Page, were men of undoubted loyalty. I do not think there is room for a doubt on this subject. The attempt to impeach them on this ground has wholly failed. It is also in proof that they were to an unusual extent rigidly observant of all the laws and regulations governing the trade in question, and gave to their employés and agents strict injunctions not to violate them in any case.

But it is insisted by the counsel for the United States, that the property in question is liable to forfeiture, on the ground that Kennedy, the local special treasury agent of the treasury, had no authority to grant the permit to the steamer Homeyer to receive and barter, in exchange for cotton, the merchandise purchased at Vicksburg. It is not controverted that Kennedy was a special agent of the treasury, but it is argued that he had no authority to grant the permit. It is certain he did assume that authority, and did give the permit. It is equally certain that the agency aid of the treasury, placed upon the steamer for the special purpose of supervising the conduct of the boat, and taking care that the law and the treasury regulations should not be violated, recognized the permit by Kennedy as valid and sufficient. And it is equally certain that the masters of the various gunboats along the river, specially charged with the duty of preventing violations of law and the treasury rules, took no exception to the authority under which the Homeyer acted, but recognized it as valid and legal. In view of all these facts, it is no strained or unreasonable presumption, in the absence of all proof to the contrary, that Kennedy's permit was valid. This presumption is not weakened by the consideration that the claimants, Parkman and Page, and their agents and employés on the steamer, acted in good faith in this transaction, and under the belief that the authority was sufficient. On a ground so purely technical as that urged, I am unwilling to have a decree for the condemnation of this property. Acting as a court of admiralty, I am fully justified in viewing the point adverted to in its equitable aspects, and avoiding such a stringent application of legal principles as will subvert the ends of justice.

I must also overrule the objection to the validity of Kennedy's permit, based on the fact that it had not the sanction and approval of the military commandant at Vicksburg. There is satisfactory proof that at the date of this permit, there was an understanding between the civil and military authorities that at Vicksburg everything connected with trade and commercial intercourse should be managed by the civil department. There is every reason to presume that while the approval of the military was not procured, the purchase of the merchandise, and the departure of the boat on her trading expedition was by permission of that authority. Certain it is there was no military order forbidding it. Vicksburg was then under martial law, and there is no reason to suppose a boat would be permitted to leave the port in violation of any law or rule civil or military.

It is also insisted, as a ground for a decree for the forfeiture of this property, that the boat, under the pretense of family supplies, had taken on board articles contraband of war, with the intention to barter them, in exchange for cotton, to rebels in arms, and thus to give aid and comfort to the rebellion. This ground is not sustained by the evidence. It would seem that a very small portion, if any, of these articles of merchandise were disposed of at the time the boat was seized. As stated already, the invoices of all these articles amounted, at the high prices at Vicksburg, to less than $8,000, and the appraisement at the market value at Cincinnati was $7,500. It would seem probable from a comparison of these values, taking into view the difference in the prices at Vicksburg and Cincinnati, that no sales were made. I think no actual sales are proved by any witness. But still if the goods shipped were contraband, and intended for sale to rebels in arms, it would undoubtedly be a good ground for a decree of forfeiture. There is, however, no reason for the conclusion that there was any purpose of giving aid and comfort to the rebellion in the purchase and shipment of these goods. The quantity was small, consisting of an assortment of dry goods, groceries, boots and shoes, and some medicines. The amount forbids the inference that there could have been any intention to dispose of them as supplies for any organized force of rebels. On the contrary, they could only be viewed as intended for sale as family supplies, and to families and individuals. And so far as they were not contraband, the sale of such goods was not prohibited. The treasury officials were authorized to grant permits for this purpose, subject to the restrictions imposed by the rules of the treasury department. It was known that the inhabitants along the Mississippi were greatly in need of such articles, and to facilitate the purchase of cotton, it was deemed expedient to permit them to be sold. They were not contraband of war, either under the law of nations, or by the legislation of congress, or the regulations of the treasury department. But there is no reliable evidence that any of these articles were sold, or intended to be sold, to rebels in arms against the government. At Gaines' Landing, in Arkansas, and at some other points

11. The practice in the courts of Pennsylvania, for the jury to find a special verdict, in a cause where the parties have not legal but have equitable claims, does not apply in the circuit court of the United States, that court having equity powers.

[See note at end of case.]

[In equity. Bill by Daniel Conn, Francis Grove, Isaac Grove, and others against John Penn and William Penn.]

Mr. Ingersoll and Edward Ingersoll, for complainants.

Mr. Rawle, Mr. Binney, and W. Rawle, for respondents.

WASHINGTON, Circuit Justice. This is a suit on the equity side of the court, brought by a number of persons, claiming by various titles equitable estates in the manor of Springetsbury, praying that the defendants, in whom the legal estate in the said manor is vested, may be compelled to convey the same according to their respective interests, upon such terms as the court may deem equitable.[2]

It will be proper, in the first place, to state the title of the proprietaries of Pennsylvania to the soil of the province, previous to the Revolutionary war, and the various acts performed by them or their agents, so far as they are connected with this cause, or have any bearing on the titles asserted by the plaintiffs; and secondly, the titles of the respective plaintiffs, so far as they have been laid before the court.

By the charter of Charles I., to William Penn, dated 4th of March, 1668, he became entitled, in his private and individual capacity, to the fee simple interest in the soil of the province, as well as to the government thereof in his political capacity. Hence it followed, that the proprietary had an unquestionable power to dispose of the soil, in such manner as he might think proper, and to reserve to his own use, such portions as he might select, and in such manner, as he might please to prescribe. But as his individual interest, not less than the policy which directed the grant to him, pointed out the necessity of encouraging the population and settlement of the province, as speedily as possible, the original proprietary, on the 11th of July, 1681, entered into an agreement with those who should wish to become purchasers of land within the province, the effect of which was, to render the proprietary a trustee for such individuals, as should acquire equitable rights to certain portions of land under general or particular promises, or such rules and regulations as he or his agents might, from time to time, establish; and for the sake of certainty, and to render public these rules by which purchasers were to be bound, an office was erected, and rules established for the government of the same, as

well as of those who might incline to obtain rights to unappropriated lands within the province; reserving to the proprietaries, a right to appropriate one-tenth of the province to themselves, for their private and individual use. By force of this agreement (as was said by this court in the case of Penn v. Klyne) all persons complying with the terms thus held out, acquired a right to the proportion of lands thus appropriated, not only against third persons who might thereafter attempt to appropriate the same lands, but even against the proprietary himself, unless he had previously, and by some act of notoriety, evinced his intention to withdraw such land from the general mass of property, and to appropriate it to his own use. As a necessary consequence of this principle, whenever such was his intention, it was made known by a warrant of appropriation, and a survey of the land so withdrawn. This was notice to all the world, that no right to the land thus laid off for the proprietaries, could be acquired by individuals without a special agreement with the proprietaries, which might or might not be on the common terms, as the proprietaries might please. But if before such special appropriation, an individual had, in compliance with the rules of the office, appropriated a tract, within the bounds of that laid off for the proprietaries, by settlement or otherwise, such prior appropriation was to be preferred to the title of the proprietaries, as to that particular tract, but no further.

By the recitals in the warrant from Governor Hamilton to the surveyor general, dated the 21st of May, 1762, which will be more particularly noticed hereafter, it appears, "that for the purpose of appropriating the tenths, as they were called, which the first proprietary by his concessions above mentioned reserved to himself, as well as to his successors, general warrants were regularly issued to the surveyor general, for the time being, by the successive proprietaries, to survey for the said proprietary, 500 acres in every township of 5,000 acres and generally the proprietary one-tenth of all the land laid out, or to be laid out; but that the tracts surveyed, for the proprietaries, had fallen far short of their due proportion." For this reason, probably, as well as for those assigned in the warrant itself, Sir William Keith, the governor of the province, on the 18th of June, 1722, issued a warrant to John French, Francis Worley, and James Mitchell, directing them to cross the Susquehanna, and to survey, mark and locate 70,000 acres of land, in the name and for the use of Springet Penn, which should bear the name and be called the manor of Springetsbury: "Beginning upon the south-west bank, over against Conestogoe creek; thence W. S. W. ten miles; thence N. W. by N. twelve miles; thence E. N. E. to the uppermost corner of a tract called Newbury; thence S. E. by S. along the head line of Newbury, to the southern corner

[2] [The case of Penn v. Klyne, Case No. 10,937, is published as a note to this case in Pet. C. C. 496.]

admiralty, I hold it to be allowable to avoid as far as possible in the rigid application of legal principles, the defeat of the ends of justice. The government of the United States ought not certainly to insist on a judgment against any of its citizens which will involve such a result. And now especially, when the formidable Rebellion with which it was confronted has been so effectually suppressed, its action should be guided by a just and considerate leniency. No greater reproach to the government can be conceived of than the unjust and unsparing pursuit of a citizen for the mercenary purpose of putting money into its coffers.

There is one transaction connected with this case to which, before concluding, I may briefly advert. It does appear that Elkins, who was on the steamer as the agent of the claimants for the purchase of cotton, entered into a contract with one Montgomery for the purchase of five hundred bales of cotton, for which payment was to be made in part with gold. This was a transaction which was in violation of one of the rules of the secretary of the treasury, prohibiting the payment of gold for cotton. This contract was entered into by Elkins in his own name, and, as it would seem, for his own individual benefit. The contract, however, was abandoned, and no cotton was delivered or placed on the boat under it. It was entered into not only without the knowledge but against the orders of the claimant, Parkman. It is in evidence that the claimants placed no gold in the hands of Elkins, and that there was none on the boat belonging to them. Now, as this contract was never carried into effect, and was entered into by Elkins on his own individual account, without the knowledge of the claimants and against their instructions, I do not see on what ground it can implicate them, or afford a basis on which a decree of forfeiture of their property can be justified.

These are the views which occur to me, after a careful consideration of this case. Libel dismissed.